No. 2479
Second Circuit

---

CHARLEY SCOTT v. STANDARD PIPE LINE COMPANY

---

(November 4, 1925, Opinion and Decree.)

---

(*Syllabus by the Editor*.)

1. Louisiana Digest—Master and Servant —Par. 159, 159 (a).

The Workmen's Compensation Law, Act No. 20 of 1914, does not prescribe the wages that an injured employee actually earns after the accident as a factor in measuring the compensation, and therefore, the wages earned by the injured employee after the accident are not to be taken as the sole criterion of what he is able to earn. His ability to obtain steady employment and the motives guiding those giving him employment should, with other circumstances be used as guides to form a conclusion.

2. Louisiana Digest—Master and Servant —Par. 160 (l); Appeal—Par. 625.

The finding of the trial judge in a Workmen's Compensation case under Act No. 20 of 1914, Section 8, Subsection 1 (c) as to the amount which the injured is able to earn being manifestly correct is affirmed.

3. **Louisiana Digest—Master and Servant —Par. 159, 160 (e).**
The proper judgment for a court to give under Section 8, Subsection 1 (c) of the Workmen's Compensation Act, No. 20 of 1914 as amended by Act 216 of 1924, is for a continuance of the allowance during disability, but not exceeding 300 weeks.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo, Hon. E. P. Mills, Judge.

This is a suit for compensation brought by an injured employee under the Workmen's Compensation Law, Act No. 20 of 1914 as amended by Act 216 of 1924. There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

Long and Crow, of Shreveport, attorneys for plaintiff, appellee.

T. M. Milling and F. L. Hargrove, of Shreveport, attorneys for defendant, appellant.

CARVER, J.    This is a suit under the Workmen's Compensation Law, Act 20 of 1914 as amended by Act 216 of 1924, in which plaintiff claims compensation under section 8, 1 (c) on the basis of partial disability to do work of any reasonable character.

While walking along a sandy road plaintiff stepped in a rut, when his ankle turned and was sprained.

Defendant admits liability for such injury as was due to the accident but claims that the chief present trouble with plaintiff's foot—displacement of the astragalus—was not caused by the accident but was congenital.

It next contends that no award can be made because the proof does not show what plaintiff was able to earn after the accident.

### I.

There was no fracture of the bone but it is admitted that the astragalus, which is a wedged-shaped bone between the ankle joint and the calcanem or heel bone, and which articulates with the tibia, fibula and calcanem, is out of place and turns upwards. It is not denied that this causes the foot to rotate.

Doctor Sanderson testifies, and we do not find it disputed, that another effect of this displacement is to throw the plaintiff's weight outside of the center of the foot instead of on the center.

He further says:

"The astragalus has been pulled loose from the ligaments holding it have been struck that hold the astragalus to the heel bone and in turning the foot over it has struck those ligaments and this astragalus is rotated partly up and the side of the foot and ankle leaving an opening between the heel bone and the astragalus of about three quarters of an inch. There is an opening between the two bones that allows that bone instead of lying flat in the ankle joint, it lies kinder upwards in the ankle joint."

"Q.  And causes a swelling of the ankle, that is the left ankle, making it somewhat larger than the right?
"A.  Yes, sir.
"Q.  Now you discovered that?
"A.  Yes.
"Q.  Is that all?
"A.  Well, yes, of course that is due to the fact that the injury disturbed these parts, also destroyed several of the foot ligaments, blood vessels and so forth, which of course carries the fluid into these parts and it cannot return freely, and there is some vein destruction there, and has been until today and of course there is a damming back of the fluid that should return back from the foot.
"Q.  Now this misplaced wedge-shaped bone, would that render the use of the foot painful?
"A.  Yes, sir, that would render that painful."

He further says that such displacement is not usually caused by an ordinary sprain which generally merely stretches the ligaments but often follows a severe or violent sprain and that it might be congenital

but that the other evidence would tend to show it was not.

Doctor Barrow on being asked if the fact that there was no fracture would tend to indicate that the condition was congenital replied:

"Well the fact that there is no fracture would not have entered into my mind, but it is possible, there is a slight abnormal position of that joint with relation to the others."

"Q. Have you formed an opinion as to the cause of that?

"A. Well, that is the cause. Yes, an opinion.

"Q. Well, what is that?

"A. Well the natural conclusion that I would reach is—that there has been a ligamentous trauma of some kind of allowing the bone to rock on each other, and I would say that that is a ligamentous or trauma, not exactly necessary, but I would say that there is a rotation and it could not have been with the ligaments in their normal tone or normal length."

Doctor Walke, on the contrary, expresses the opinion that the displacement was a natural deformity, giving as a reason that the pain complained of by plaintiff was in the metatarsal bones which are more than an inch away from the astragalus.

Buckhanan, a witness for defendant, who had been working with plaintiff for some time before the accident, "a week or such a matter", says that although the work was pretty hard he does not remember plaintiff limping and that plaintiff did not complain of his foot before the accident.

On this evidence we cannot say that the lower judge erred in finding that the entire injury to plaintiff's foot was caused by the accident.

## II.

Plaintiff was receiving $27.00 a week before the accident and admits that he is now able to earn $5.00 a week. He does not complain of the action of the district judge in finding that he can earn $10.00 per week; his demand in this court not being for a larger weekly allowance but for continuance of the allowance during disability not exceeding 300 weeks instead of for a fixed period of 100 weeks.

Defendant urges that plaintiff's claim should be rejected because of the failure of the proof to establish what amount he is able to earn. The only proof in the record is the testimony of plaintiff himself.

"Q. You can walk on the foot some?

"A. Yes, sir.

"Q. You can do some kind of work?

"A. Yes, sir.

"Q. Have you been able to find any kind of work that you could do?

"A. No, sir, not so far.

"Q. I believe that you admit that you can earn as much as five dollars per week?

"A. Yes, sir.

"Q. Have you earned that since then?

"A. No, sir, I have not."

Section 8, 1 (c), is as follows:

"For injury producing partial disability to do work of any reasonable character, sixty-five per centum of the difference between wages at the time of injury and wages which the injured employee is able to earn thereafter during the period of disability, not, however, beyond three hundred weeks."

A careful inspection of this language makes it apparent that the basis of the injured workman's right of recovery is his having suffered an injury producing partial disability to do work of any reasonable character.

It is true that the measure of his right is 65% of the difference between the wages he received at the time of the injury and those which he is able to earn thereafter; but while this difference is prescribed as the measure of his right, his right is not made to depend on whether he does or does not actually earn anything after the accident.

It is apparent, too, that the act does not prescribe the wages he actually earns

after the accident as a factor in measuring the compensation and, in our opinion, such wages, even where some are earned, are not to be taken as the sole criterion of what he is able to earn. This would in many cases be an unsafe guide.

Sometimes a workman can get the same wages per week as before but cannot secure employment so readily or so steadily. Sometimes he is given a steady job by friends for sympathy and paid former wages.

Sometimes the former employer will give him an easy job at the same wages for philanthropic motives, and, in some cases, it is contended, for the less worthy motive of minimizing the compensation for which he is liable.

Sometimes other causes affecting the earning capacity intervene; as industrial expansion, to increase demand for labor with consequent increase of wages; or industrial depression, to reduce these; or sickness or another accident unrelated to that for which the employer owes compensation.

Sometimes the workman might have means which would enable him to take a long rest without working to increase his chance of recovery.

In some cases it is charged that he deliberately earns less than he could for the fraudulent purposes of increasing his claim for compensation.

In some cases the trial might be held too soon after the accident to afford opportunity to test earning capacity by actual experience.

In some of such cases, the test of wages actually earned could not be applied at all, and in the rest it is not an absolute criterion, but merely a guide to be considered along with other factors in determining what the workman's earning capacity is.

The wages actually earned could be a safe sole criterion only where all conditions were the same as before the accident, where neither the workman nor the employer was finessing for position, and where the work the workman gets is obtained and paid for solely on the basis of its worth.

We find no warrant in the law for denying compensation for admitted or proven partial disability to do work of a reasonable character merely because the proof does not show what the workman can earn by the method of showing what he does earn.

What the court is required to do is to ascertain what he is able to earn. Where he does not earn anything, it is more difficult to do this than where he does; but it is not more difficult than many other problems which courts must solve as best they can by the use of discretion, their knowledge of men and affairs, and by decisions in analogous cases. In personal injury suits courts have no criterion but must fix damages as best they can. In claims for improvements the same thing must be done.

Under all the proof in this case, we think the district judge solved the question of what plaintiff was able to earn with approximate justice in finding that this was ten dollars a week.

We think, though, that he erred in fixing 100 weeks as the period during which the plaintiff should be entitled to compensation. The correct period, in our judgment, should be during disability, which may be more or less than 100 weeks but which, under the statute, cannot exceed 300 weeks.

The accident in this case happened January 31, 1925. The trial was held May 15, 1925. To determine when the condition of partial disability will cease, is too much a matter of conjecture to warrant the court in fixing on any certain time. This is what we held in the cases of

Chandler vs. Oil Fields Gas Co., 2 La. App. 778.

O'Donnell vs. Fortuna Oil Co., 2 La. App. 462.

Price vs. Gilliland Oil Co., 3 La. App. 175.

King vs. McClanahan, 3 La. App. 117.

For these reasons it is decreed that the judgment of the lower court be so amended that the compensation of $11.05 per week awarded plaintiff for partial disability instead of being paid him for 100 weeks be paid during such disability but not exceeding 294 weeks being 300 weeks less the six weeks allowed for total disability.

It is further decreed that in all other respects the judgment of the lower court be affirmed and that defendant pay costs of both courts.